UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA  :
:
:
:
vs.  :  CASE NO: 3:00-30027-001
:
:
GARY WHITE  :

CA 05-30132- MAP

PETITIONER'S WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. SECTION 2255

COMES NOW, Gary White, pro se, and hereby moves this Court to Vacate the sentence imposed upon him based on procedural defaults, Fifth and Sixth Amendments Violations. On September 21, 2000, the grand jury returned a ten Count indictment naming the defendant with participating in a drug distribution conspiracy, and with distinct acts of distribution of cocaine or cocaine base drug offenses.

The trial in the District Court before a jury began on September 10, 2001. The trial was interrupted after opening statements on September 11, 2001, after the terrorist attacks. The Court recessed and the trial did not resume until two days later, on September 13, 2001.

The government rested it's case on September 24, 2001. On September 26, 2001, the jury returned its verdicts, finding the defendant guilty of each count for which he was charged. The defendant filed an appeal and on November 26, 2003, a panel of

judges of this Court affirmed the Convictions.

The government failed to introduce sufficient evidence to show, directly or by inference, that the defendant was not improperly induced or predisposed to commit the crime. The undisputed facts of the undercover operation established that the defendant was entrapped as a matter of law. United States v. Jacobson, 503 U.S. 540, 112 S.Ct 1535 (1992).

The undercover operation against the defendant began in 1999. The government had previously obtained the defendant's name from a confidential informant, Christopher Weeks, working on behalf of and under the direction of, the government. The informant, Weeks introduced Detective Fisher to the defendant. Prior to this introduction, the informant had called on the defendant on numerous occasions, both in person, by telephone, and through the defendant's family threatening and eventually inducing him to meeting the undercover agent, later identified as Detective Fisher.

The defendant and Detective Fisher testified regarding the government's use of a confidential informant, Christopher Weeks. The defendant testified Weeks had threatened injury to himself and his family on many occasions unless he helped Weeks obtain drugs. Detective Fisher never monitored the informant Weeks and knew nothing of Week's Methods in negotiating with the defendant. There being no rebuttal from Weeks himself, there was sufficient evidence presented by the defendant to raise the entrapment issue. In determining whether entrapment has been established "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." Sherman v. U.S.,

356 US 369, 372 (1958). The defense of entrapment is appropriately raised, as it was in this Case, by introduction of some evidence of inducement by a government agent or one acting in his direction. Mere evidence of solicitation is not enough to show inducement, but little more than solicitation is required to raise the issue. "Any evidence that the government agents went beyond a simple request and pleaded or argued with the defendant should be enough." Kadis v. U.S., 373 F.2d 370, 374 (1st Cir. 1967). When evidence of inducement has been entered, the burden rests upon the government to prove beyond a reasonable doubt the predisposition of the defendant to commit the crime. Once government inducement has been shown, there are two issues. The government should establish and engage in no Conduct that was shocking or offensive per se, and that the defendant was not, corrupted by the inducement. Whiting v. U.S., 321 F.2d 72, 76 (1st Cir. 1993).

In his lecture on Criminal Law, Oliver Wendel Holmes. Jr., observed: "The law threatens certain pains if you do certain things, intending thereby to give you a new motive for not doing them, if you persist in doing them it has to inflict the pains in order that it's threats may continue to be believed. The prosecutor threatened Gary White with certain pains if he unlawfully possessed with intent to distribute cocaine and cocaine base, with additional pains if he was in conspiracy with others and if he was in a distinct acts of distribution of cocaine or cocaine base drug offenses. As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect

3

Mr. Gary White from unwarranted pains should apply equally to these acts that prosecutor has singled out for punishment. At stake in this Case are Constitutional protection of surpassing importance: the proscription of any deprivation of Liberty without "Due Process of Law." Amdt. 14, <u>U.S. v. Gaudin</u>, 515 U.S. 506, 510 (1995) see also <u>Sullivan v. Louisana</u>, 508 U.S. 275, 278 (1993); <u>Winship</u>, 397 U.S., at 364 "The Due process clause protects the accused against illegal conviction except upon proven beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

In order for an accusation of a crime (whether by indictment or some other form) to be proper under the Common Law and thus proper under the condification of the Common Law rights in the Fifth and Sixth Amendments, it must be alleged all elements of that crime. ("When the law prescribe a different punishment for different phases of the same crime, there is good reason for requiring the indictment to specify which of the phases the prisoner is charged with. The record ought to show that the defendant is Convicted of the offense for which he is sentenced.") C.F. <u>State v. Fair</u>, IZ Rich, 24, 29 (S.C. App 1859) where two statutes barred purchasing corn from a slave and one referred to purchasing from a slave who lacked a permit, absence of permit was not an element, because both statutes had different punishment with different degree.

An 1872 treatise by one of the leading authorities of the era in Criminal Law and procedure confirms the Common Law understanding that the above demonstrate. The treatise condensed the

4

traditional understanding regarding the indictment, and thus the element of a crime to the following. "The indictment must allege whatever is in law essential to the punishment sought to be inflicted." IJ Bishop, Law of Criminal Procedure 50 (2d ed 1872) See id. section 81, at 51 ("The indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted") id., section 540, at 330. "The indictment must contain an averment of every particular thing which enters into the punishment.")

"An accusation which lacks any particular fact which the law makes essential to the punishment is no accusation within the requirement of the Common Law, and it is no accusation in reason." 1 Bishop, Criminal Procedure section 87, at 55. See Id., section 88, at 56 (notice and indictment) requirement ensure that before "person held for crimes . . . . shall be Convicted, there shall be an allegation made against them of every element of Crime which the law makes essential to the punishment to be inflicted.

## DUE PROCESS

The legislative is the branch of government empowered to bestow subject matter jurisdiction upon the Court and to determine the extent of a State sovereign immunity. Moreover, it is empowered to make, interpret, and enforce it's own procedural rules, and the judiciary cannot compel the legislative to act in accordance with it's own procedural rules so long as Constitutional questions are not implicated.

The power of punishment is vested in the legislature, not the judicial department, and it is the legislature, not the judiciary, which is to define a crime and ordain the general limit of it's punishment. the legislature has great latitude in defining criminal conduct and in prescribing penalties of society, and the function of the legislature in this area is primary, it's exercises fortified by presumptions of right and legality, and it is not to be interfered with lightly nor by any judicial conception of their wisdom or propriety.

The due process of the law is the primary and indispensable foundation of individual freedoms; it is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the States may exercise. The fundamental guarantee of due process is absolute, not merely relative. It does not have regards merely to enforcement of the law, but searches also the authority for making the law, and it is not merely a political right, but is a legal right assertable in the Courts. By reason of this guarantee, everyone is entitled to the protection of those fundamental principles of liberty and justice which lie at the basis of all our Civil and Political institutions and that have long been recognized under the Common Law system, and which are not infrequent designated as the "Law of the land."

A State's obligations under the fourteenth Amendment are not simply generalized one's: rather, the State owes to each individual that process which, in light of the values of a free society, can be characterized as due. The question as to what constitute

6

due process of law is purely juristic and is beyond the scope of legislative competence. In evaluating a due process claim, a Court must determine whether a property or liberty interest exists and, if so, what procedures are Constitutionally required to protect that right. When a particular Bill of Rights provision has been made applicable to the States by the fourteenth Amendment, and provides an explicit textual source of Constitutional protection against a particular sort of government behavior, that Amendment and not some more generalized notion of substantive due process must be the guide for analyzing claims. Due process expresses a requirement of fundamental fairness. Applying the Due process clause is an uncertain enterprise which must discover what fundamental fairness consist of in a particular situation by first considering any relevant precedents and then by assessing the several interest that are at stake.

The term "Due process of Law" asserts a fundamental principle of justice, rather than a specific rule of law, and thus is not susceptible of more than a general statement of it's intent and meaning, which are ascertained in the history of it's specific applications to Cases requiring judicial decisions. The primary guide in determining whether a principle is a fundamental principle of justice protected by the Due process clause is historical practice.

The rule that what free people have found consistent with their enjoyment of freedom for centuries is not to be deemed to violate dueprocess does not freeze due process within the confines of historical facts or discredited attitudes, it being of the very nature of a free society to advance in it's standards of

7

what is deemed reasonable and right. The Courts usually have contented themselves in ascertaining the intent and application of this important phrase, with the process of judicial inclusion and exclusion as the Cases presented for decision have risen.

The real clue to the problem confronting the judiciary in the application of the Due Process Clause is not ask where the line is once and for all is been drawn, but to recognize that it is for the Court to draw it by the gradual and empiric process of inclusion and exclusion. Due process is an elusive concept; it's exact boundaries are undefinable and it's content varies according to specific factual contexts. The doctrine of a particular Case is not allowed to end with it's enunciation, and an expression in an opinion yields later to the impact of facts unforeseen. Thus, what is due process depends on circumstances varying with the subject matter and the neccessities of the situation. The content of due process is function of many variables, including the nature of the right affected, the degreee of damage caused by the proscribed condition or activity, and the availability of prompt remedial measures, it also depends, to some extent on which powers of government are being exercised and the purposes to be accomplished.

The Due Process clause was to prevent the government from abusing it's power or employing it as an instrument of oppression. Due process is not an end in itself; it's Constitutional purpose is to protect a substantive interest to which an individual has a legitimate claim of entitlement. Another purpose of the Due Process Clause is to protect the people from the State, but not

8

to ensure that the State protects them from each other.

## THE CONFRONTATION CLAUSE ISSUE

The trial Court erred by allowing the District Court to present hearsay testimony of an officer of the law concerning highly incriminating statements made by Confidential informant or government informant. The Sixth Amendment's confrontation clause provides that "In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." This bedrock procedural guarantee applies to both federal and state prosecutions.

Pointer v. Texas, 380 U.S. 400, 406 (1965). Defendant argues that this test strays from the original meaning of the Confrontation Clause and urge for reconsideration by the District Court. See (Washington v. Crawford) cite as: 541 U.S. (2004). The right to Confront one's accuser's is a concept that dates back to Roman times. See Coy v. Iowa, 487 U.S. 1012, 1015 (1998) Hermann and Speer, facing the Accuser: Ancient and Medieval precursors of the Confrontation Clause, 34 Va, J Int'l. 481 (1994). The founding generations immediate source of the Concept, however, was the Common Law. English Common Law has long differed from Continental Civil Law in regard to the manner in which witnesses give testimony in Criminal trials. The Common-Law tradition is one of live testimony in Court subject to adversarial testing, while the Civil Law condones examination in private by judicial officers.

See 3 W. Blackstone, Commentaries on the Law of England 373-374 (1768). Nonetheless, England at times adopted elements of the Civil practice. Justice of the peace or other officials examined suspects and witnesses before trial. These examinations were sometimes read in Court in lieu of live testimony, a practice that "Occasioned frequent demand by the prisoner to have his accuser i.e. the witnesses against him, brought before him face to face." I J. Stephen. History of the Criminal Law of England 326 (1883). John Adams, one of the founding fathers a Merchant in a high-profile admiralty Case, argued: "Examination of Witnesses upon interrogatories, are only the civil Law. Interrogatories are unknown at Common Law, and Englishmen and Common Lawyers have an aversion to them if not an abhorrence of them." Draft of Argument in <u>Sewall v. Hancock</u>, (1768-1769), in two legal papers of John Adams 194, 207 (K. Wroth and H Zobel eds. 1965). Many declarations of rights of Confrontation. See Virginia Declaration of Rights section 8 (1776); Pennsylvania Declaration of Rights Section IX (1776)., Delaware Declaration of Right's Section 14 (1776)., Maryland Declaration of Rights Section XIX (1776)., North Carolina Declaration of Rights Section VII (1776)., Vermont Declaration of Rights Ch. 1, Section X (1777)., Massachusetts Declaration of Rights Section (1780)., New Hampshire Bill of Rights Section XV (1783), all reprinted in 1 B, Schwartz. The Bill of Rights; A documentary history 235, 265, 278, 282, 287, 323, 342, 377 (1971). Two Debates on federal Constitution 110-111 (J. Elliot 2d ed 1863) Criticized the use of "Written evidence while objecting to the omission of a vicinage right" Nothing can

be more essential than the Cross examining of Witnesses and generally before the triers of the facts in question . . . . Written evidence . . . . is almost useless; it must be frequently taken ex parte, and but very seldom lead to the proper discovery of truth." R. Lee letter IV by the federal farmer (Oct. 15, 1787), reprinted in I Schwartz, Supra, at 469, 473. The first Congress responded by including the Confrontation Clause in the proposal that became the Sixth Amendment.

Early State decisions shed light upon the original understanding of the Common-Law right. State v. Webb, 2 N.C. 103 (1794) (per curiam), decided a mere three years after the adoption of the Sixth Amendment, held that depositions could be read against an accused only if they were taken in his presence. Rejecting a broader reading of the English authorities, the Court held: "It is a rule of the Common Law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to Cross examine." Id., at 104.
The Court said that one of the "Indispensable Conditions" implicitly guaranteed by the State Constitution was that "prosecutions be carried on to the Conviction of the accused, by witnesses Confronted by him, and subjected to his personal examination." Ibid. Many other decisions are to the same effect. Some early Cases went so far as to hold that prior testimony was inadmissable in Criminal Cases even if the accused had a previous opportunity to Cross-examine. See Finn v. Commonwealth, 26 Va. 701, 708 (1827) State v. Atkins, 1 Tenn 229 (1807) (per curiam).

This history supports two inference about the meaning of the Sixth Amendment. First, the principal evil at which the Confrontation Clause was directed was the Civil-Law mode of Criminal procedure, and particularly it's use of ex parte examinations as evidence against the accused. It was these practices that the Crown deployed in notorious treason Cases like Raleigh's; that the Marian statutes invited; that English Law's assertion of a right to Confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind.

The text of the Confrontation Clause reflects this focus, it applies to "Witnesses" against the accused in other words, those who "bear testimony." I N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Ibid. An accuser who makes a formal statement to government officers bear testimony in a sense that a person who makes a casual remark to an acquaintance does not. The Constitutional text, like the history underlying the Common Law right of Confrontation, thus reflects an especially acute concern with a specific type of out of Court statement.

Statement taken by police officers in the course of interrogations bear a striking resemblance to examinations by justice of the peace of England. The statements are not sworn testimony but the absence of oath was not dispositive. Cobham's examination was UnSworn, See ! Jardine, Criminal Trials at 430, yet Raleigh's trial has long been thought a paradigmatic Confrontation Violation,

12

See, e.g., Campbell, 1 S.C., at 130. Under the Marian Statutes, Witnesses were typically put on oath, but suspect were not. See 2 Hale. Pleas of the Crown at 52. The framers would not have allowed admission of testimonial statements of a witness who did not appear at trail unless he was unavailable to testify, and the defendant had a prior opportunity for Cross-examination. The text of the Sixth Amendment does not suffest any open-ended exception from the Confrontation requirement to be developed by the Courts. Rather, the "right .... to be Confronted with the witnesses against him." Amdt. 6, is most naturally read as a reference to the right of Confrontation at Common Law, admitting only those exceptions established at the time of the founding. The Sixth Amendment therefore incorporates those limitations. The numerous early state decisions applying the same test confirm that these principles were received as part of the Common Law of this Country.

("Accomplices confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule"). In Mattox v. United States, 156 U.S. 237 (1895) In allowing the statement be admitted, the facts relied on was "the defendant had, at the first trial, an adequate opportunity to confront the witness." "The substance of the Constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a Cross examination. This, the Law says, he shall under no circumstances be deprived of . . . . Id. at 244. The Mattox's holding is that prior trial or preliminary hearing

13

testimony is admissible only if the defendant had an adequate opportunity to Cross examine. See <u>Mancusi v. Stubbs</u>, 408 U.S. 204, 213, 216 (1972)., <u>California v. Green</u>, 399 U.S. 149, 165-168 (1970)., <u>Pointer v. Texas</u>, 380 U.S. at 406-408., cf. <u>Kirby v. United States</u>, 174 U.S. 47, 55-61 (1899).

The United States Supreme Court reasoning in <u>Washington v. Crawford</u> cite as: 541 U.S. ____ (2004) remained faithful to the framers understanding: Testimonial statements of Witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to Croxx-examine. Although the results of the Court decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales. This test departs from the historical principles identified in two respects.

First, it is too broad: it applies the same mode of Analysis whether or not the hearsay consist of ex parte testimony. This often results in close Constitutional scrutiny in Cases that are far removed from the Core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that do consist of ex parte testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic Confrontation Violations.

The Court offered two proposals: First, applying the Confrontation Clause only to testimonial statements, leaving the remainder to regulation by hearsay law thus eliminating the overbreadth referred to above. Second, that they impose an absolute bar to

14

Statements that are testimonial, absent a prior opportunity to Cross examine-thus eliminating the excessive narrowness referred to above. Where testimonial statements are involved, majority in the Crawford opinion think the framers meant to leave the Sixth Amendment's protection the vagaries of the rule of evidence, much less to amorphous notion of "reliability." Admitting statements deemed reliable by a Judge is fundamentally at odds with the right of Confrontation.

It is not plausible that the framers only objection to the trial was that Raleigh's Judges did not properly weigh these factors before sentencing him to death. Rather, the problem was that the Judge refused to allow Raleigh to Confront Cobham in Court, where he could Cross-examine him and try to expose his accusation as a lie. Dispensing with Confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes. To add insult to injury, some of the Courts that admit untested testimonial statements find reliability in the very factors that makes the statements testimonial. The framers would be astounded to learn that ex parte testimony could be admitted against a Criminal defendant because it was elicited by "neutral" government officers. But even if the Court's assessment of the officer's motives was accurate, it says nothing about the defendant's perception of the situation. Only Cross examination could reveal that.

When a law enforcement official testifies as both a fact and expert witness, there is a risk of misleading the jury into affording unwarranted Credibility to the witness's non expert

15

testimony, the Court added. The danger that his expert testimony will stray from applying expert Methodology, it's making sweeping conclusions about a defendant's criminal activities, thus becomes particularly acute. This type of testimony therefore not only implicates Rule 702, but Rule 403 as well, as it may be the type that would tend to confuse or mislead a finder of fact. Therefore, "Courts must be especially vigilant in evaluating the admissibility of expert testimony where, as in (<u>Washington v. Crawford</u>) a law enforcement official was called on to testify as a fact witness but also functions as an expert for the government," the Court said.

Where testimonial evidence is at issue, however, the Sixth Amendment demands what the Common Law required: unavailability and a prior opportunity for Cross examination. Where testimonial statement are at issue, the only indicium of reliability sufficient to satisfy Constitutional demands is the one the Constitution actually prescribed: Confrontation.
The mandatory nature of the Guidelines has produced particular results which led trial Judges to express that the sentences imposed were unjust, grossly unfair, or disproportionate to the crime Committed, and the Judges would otherwise have sentenced differently, that is a powerful argument for remand.

The same procedural safeguard of Sixth Amendment principle should apply to the defendant Mr. Gary White.

For the reasons set forth above, the Judgement of Conviction should be reversed.

## CERTIFICATE OF SERVICE

I Gary White, the undersigned, do hereby certify that I caused to be mailed by placement in the institutional mail box, first class postage prepaid, a true copy of the following: Motion to reversed conviction: Writ of Habeas Corpus in pursuant to 28 U.S.C. Section 2255 with attached "Argument,' to: U.S. Attorney's Office at 1550 Main Street, Third floor, Springfield MA 01103.

*Gary White*
Gary White
Reg. No. 90555-038
P.O. Box 2000
White Deer, PA. 17887