UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GARY WHITE,                          )
         Petitioner                  )
                                     )
    v.                               )   CA 05-30132-MAP
                                     )   CR 03-30027-MAP
                                     )
UNITED STATES OF AMERICA,            )
         Respondent.                 )

GOVERNMENT'S RESPONSE TO GARY WHITE'S MOTION
PURSUANT TO 28 U.S.C. § 2255 TO VACATE,
SET ASIDE OR CORRECT HIS SENTENCE

The United States of America, by its undersigned attorneys, submits this memorandum in response to Gary White's 28 U.S.C. § 2255 Motion and Memorandum.

I.  Background

On September 21, 2000, the defendant was indicted by a grand jury in a ten-count indictment along with three co-defendants. Count One charged that the defendants conspired to distribute cocaine base in violation of 21 U.S.C. § 846. The defendant was charged in Counts Two through Nine with distributing cocaine or cocaine base in violation of 21 U.S.C. § 841(a)(1). On September 10, 2001 trial commenced, but was briefly halted due to the events of September 11, 2001. On September 26, 2001, after a ten-day jury trial, White was convicted on all counts. On April 3, 2002 he was sentenced to 292 months in prison on all counts.

White filed a direct appeal and on November 26, 2003, the First Circuit affirmed his conviction and sentence. United

1

States v. Capleton, 350 F.3d 231 (1st Cir. 2003). In that appeal White "claim[ed] that there was insufficient evidence to prove either the absence of improper inducement or predispositon." Capleton, at 350 F.3d at 242-43. On December 12, 2003, White filed a Motion for Rehearing En Banc which was denied on January 30, 2004. A Mandate entered on February 6, 2004. White then filed a petition for a writ of certiorari in the United States Supreme Court which was denied on June 7, 2004. White filed the current § 2255 petition in this Court on June 6, 2005.

The defendant now seeks to have his conviction reversed. Motion at 16. He re-alleges that "[t]he government failed to introduce sufficient evidence to show, directly or by inference, that the defendant was not improperly induced or predisposed to commit the crime. The undisputed facts of the undercover operation establish that the defendant was entrapped as a matter of law." Motion at 2.[1]

For the reasons set forth herein, the Court should deny the defendant's motion.

---

[1]White also states "[t]he trial Court erred by allowing the District Court to present hearsay testimony of an officer of the law concerning highly incriminating statements made by Confidential informant or government informant." Motion at 9. The defendant provides no details or explanation for this claim. Without further details, the government is unable to respond. However, it is worthy of note that the majority of the evidence admitted at trial were audio and video recorded conversations between the UCA and White which are not hearsay pursuant to F. R. Evid. 801(d)(2)(A).

2

II. Facts

The evidence introduced at trial included the testimony of an undercover agent ("UCA") and the consensually recorded telephone conversations and meetings the UCA had with the defendant for the purpose of purchasing crack cocaine. Most of the actual drug transactions were also videotaped.

In December, 1999, Detective Al Fisher from the Chicopee Police Department contacted DEA SA Clarence Shuler and requested assistance in continuing an investigation of White. A confidential informant had introduced Fisher to White on December 7, 1999 at which time Fisher purchased a small quantity of cocaine from White. White told Fisher that he could sell any amount of cocaine or crack cocaine to Fisher. Because the DEA had the needed buy money, the investigation was taken over by the DEA. Fisher, acting in an undercover capacity, proceeded to make one purchase of cocaine and seven purchases of cocaine base from White. White acted as a narcotics broker. In numerous recorded statements White made clear that he had many sources of supply and could obtain various drugs in whatever quantity his clients wanted.

The first purchase of cocaine occurred on December 21, 1999, and took place in White's residence. The UCA entered White's house at 151 Marion Street, Springfield and met White. After waiting for over half an hour, White's source of supply, an

3

unknown black male, arrived and gave White the cocaine. White handed the UCA 9.8 grams of cocaine and the UCA paid White.

Every other drug transaction proceeded as follows: the UCA would contact White and negotiate the purchase of a specified amount of cocaine base for a certain price. White then "called around" until he "hooked up" with a supplier. White would then call the UCA and make final arrangements for the transaction. His sources of supply were Edwin Rodriguez, Lincoln Brown and Jerome Capelton.

The UCA's telephone conversations and the meetings during the drug deals were consensually recorded on audio and/or video tape. With the exception of the UCA's initial purchase of cocaine on December 21, 1999, all of the drug transactions took place in the UCA's undercover vehicle which was equipped with video and audio.

Edwin Rodriguez supplied 113.1 grams of cocaine base to White on January 6, 2000. On January 5th and 6th, the UCA negotiated the purchase of four ounces of crack for $4,000 from White. During a consensually recorded phone call on January 6, 2000, between White and the UCA, White used a three way calling feature and got Rodriguez on the phone. Rodriguez was intercepted discussing the arrangements for the deal. Once the deal was set up, the UCA arrived at White's residence at the appointed time. White, who was expecting the UCA, came out of

his house and got into the UCA's car. White said that his source is "on his way." Shortly thereafter, Rodriguez arrived and parked his vehicle directly across the street from the UCA's car. When Rodriguez exited from his car, the UCA was able to see a plastic bag with a red stripe in Rodriguez' hand. White got out of the UCA's car, met Rodriguez on the street, and then White and Rodriguez went into White's house. White returned to the UCA's car within moments and handed the UCA the same plastic bag that the UCA observed earlier. The bag contained 113.1 grams of cocaine base in the form of crack cocaine. The UCA gave White the prerecorded money and left the area.

    Surveillance agents then observed Rodriguez and White conversing on White's front porch before Rodriguez left in his car. Rodriguez was followed and subsequently stopped by a Springfield police officer at the DEA's request. Rodriguez had $5,700 on his person. Two task force agents were able to determine that some of the money ($1,400) consisted of the official funds used by the UCA to buy the crack cocaine earlier. Although the money was not seized, the agents were able to write down the serial numbers for subsequent identification. Rodriguez was not involved in any of the subsequent purchases of narcotics from White.

    Lincoln Brown supplied White with cocaine base in the form of crack cocaine on three occasions, March 17, 2000, March 24,

2000, and June 2, 2000. On March 17, 2000 following their usual practice, the UCA made arrangements with White to purchase one ounce of crack for $1,000. The UCA then waited for White to contact him and let him know when the cocaine arrived. Meanwhile, surveillance agents observed Brown arrive and enter White's house. Moments later, White notified the UCA to hurry up because his source had arrived. The drug transaction then took place between the UCA and White in the UCA's car while Brown remained in the house. The weight of the crack cocaine was 24.3 grams.

On March 24, 2000 the UCA purchased 131.6 grams of crack cocaine for $5,000. Once again, in a series of recorded telephone conversations, the UCA arranged to purchase the crack from White. The UCA waited to hear from White before going to White's house. As the UCA was waiting, surveillance agents observed Brown arrive in a different car. This time Brown had a driver. As soon as Brown entered White's house, White contacted the UCA and told him that he was all set. White then conducted the transaction with the UCA in the UCA's car while Brown remained in the house and his driver conducted counter surveillance. Approximately two weeks later, the UCA complained to White that the "weight" he purchased on March 24th was light. White responded by explaining that the UCA came so fast after the source arrived that White did not have time to weigh the product.

No one but Brown arrived at White's house before the deal took place. The weight of the crack cocaine was 131.6 grams.

The UCA purchased cocaine base from White on two separate occasions on May 4, 2000. The first transaction involved 81.7 grams of cocaine base and the second purchase was for 51.2 grams of cocaine base. Both sales took place in the UCA's car while he was parked outside of White's residence. Capelton first arrived on the scene during the May 4th transaction. Capelton drove by on a motorcycle and positioned himself so that he could observe White's house. After the UCA purchased the initial 81.7 grams of crack, Capelton followed him out of the area and then returned to White's house and picked up Brown, who had delivered the crack cocaine. The UCA returned an hour later and purchased 51.2 grams of crack cocaine from White.

On June 2, 2000 the UCA purchased 239.2 grams of crack cocaine for $9,000.00 from White, Brown and Capelton. The deal was preceded by recorded telephonic negotiations between the UCA and White. Approximately twenty minutes before the UCA arrived to meet with White, Brown and Capelton arrived at White's residence in separate rental cars. Surveillance officers observed White, Brown and Capelton conversing in Capelton's car and also observed Brown enter the house. As he did on previous occasions, Brown remained in the house when White met with the UCA. Capelton remained alone in his car during the transaction.

White got into the UCA's car immediately after he arrived at 151 Marion Street. White is captured on videotape saying that he wanted the UCA to give him the buy money so that he could give it to his guy who was waiting across the street. The UCA refused to give up the money before he had the crack cocaine. The UCA and a surveillance agent then watched as White got out of the UCA's car and walked directly across the street and leaned inside the open driver's side window of the car Capleton was driving. When White moved away from the car he had a plastic bag in his hand which he attempted to hide under his arm inside an open shirt he was wearing. White walked across the street and got into the UCA's car and can be seen on video tape handing the UCA the bag he just got from Capleton. Following his usual practice, White began to count the money that the UCA gave him while he was still in the UCA's car. However, before he had counted all the money, White pointed to Capelton's car and stated "I'll finish counting it in the car." Afterward, White reentered his house and met with Brown. Then, Brown and Capelton met and conversed in Capelton's car.

Thereafter, between June 2nd and July 24th when the UCA purchased another 136.6 grams of crack from White, White told Fisher that his source (Capelton) was family and was going to cut out the middle man (Brown). Brown was not involved again.

On July 24, 2000 the UCA purchased 136.6 grams of crack

cocaine for $6,000.00 from White, Capelton and an unknown black male. After completing arrangements to purchase the crack on the telephone, the UCA proceeded to White's house at approximately 1:20 p.m. Just five minutes earlier, Capelton drove up to White's house in a rented Cadillac sedan and met briefly with White. Capelton was a passenger in the vehicle. The driver has not been identified. After meeting with White, the car Capelton was in drove down the street, made a u-turn and parked facing 151 Marion Street. A surveillance agent was parked directly across the street from Capelton's car. Meanwhile, White re-entered his house and sent a "911" page to the UCA. The page served to notify the UCA that the crack had arrived. The UCA then drove up and met with White in his car. Like all previous transactions, the sale of narcotics was videotaped. During the exchange, White stated that he was going to give the money to the people "down the street" and pointed to the Cadillac. Once the UCA drove away, the Cadillac drove up to White. White entered the car, stayed for a few minutes and then returned to his house as the Cadillac drove away.

On August 23, 2000 the UCA purchased 124.4 grams of crack cocaine for $4,800.00 from White and Capelton. The deal proceeded as usual. After negotiations were complete, the UCA drove to 151 Marion Street and White got into the UCA car. A surveillance agent was parked across the street and video taped

what was happening. White remained in the UCA car until Capelton arrived at White's house in a rented gray Pontiac. Capelton stopped right next to the UCA's car and blew the horn. White said "here he is" and got out of the UCA's car. Capelton, who was alone in the Pontiac, parked across the street from the UCA and White got into the car for approximately 30 seconds. White then got out of Capelton's car and back into the UCA's car and handed the UCA a plastic bag containing the crack cocaine. The UCA gave White $4,800 of pre-recorded buy money. In addition, agents were able to stop Capelton after the deal was completed and retrieved $3,250.00 of the $4,800 in buy money that the UCA had used to purchase the crack cocaine from White that day. The stop occurred as follows: prior to conducting the drug transaction on August 23rd, White told the UCA that his source (Capelton) was on his way to the city (New York City) to "recop," i.e. to obtain additional drugs. After the deal, Capelton drove away from 151 Marion Street and was followed by several surveillance agents. The agents watched as Capelton drove to Kimball Towers on Chestnut Street, Springfield and picked up another male and two small children. Capelton then drove to a gas station on West Columbus Avenue and put gas in the car. Capelton then proceeded south on I-91 toward New York. At DEA's request, his car was stopped by the Connecticut State Police ("CSP") south of Hartford, Connecticut. CSP seized over $5,220

from Capelton's person. As noted above, of the money seized from Capleton's pocket, $3,250 was pre-recorded buy money used by the UCA one hour earlier to buy the crack cocaine from White.

On September 21, 2000 White agreed to sell the UCA one-half kilogram of crack cocaine for $14,000. The UCA went to 151 Marion Street and White told the UCA they would have to drive to another location to pick up the crack cocaine. Because White was acting suspiciously, the DEA decided to arrest White. White ran upon seeing the DEA agents approaching him and was caught after a foot chase several blocks away. In a post Miranda statement, White admitted he did not have any crack cocaine that day and planned to steal the $14,000 from the UCA.

III. White's § 2255 Claims Have Either Been Previously Decided or Waived

White raised the entrapment issue in his direct appeal. The First Circuit affirmed his conviction. United States v. Capleton, 350 F.3d 231, 242-43 (1st Cir. 2003). When a claim is decided on direct appeal it cannot be relitigated under § 2255 except in unusual circumstances. Withrow v. Williams, 507 U.S. 680, 720-21 (1993)(Scalia, J., concurring); Argencourt v. United States, 78 F.3d 14, 16 n.1 (1st Cir. 1996). The only substantial exception is an intervening change in the governing substantive law. Davis v. United States, 417 U.S. 333 (1974). No such exception exists in this case. Therefore, the defendant is precluded from relitigating this issue.

IV. Conclusion

For the reason set forth above, the defendant's motion to vacate, set aside or correct his sentence should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

by: _____
TODD E. NEWHOUSE
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

Hampden, ss.                          Springfield, Massachusetts
                                      June 10, 2005

I, Todd E. Newhouse, Assistant U.S. Attorney, do hereby certify that I have served, by first class mail, a copy of the foregoing, to Gary White, pro-se, Reg. No. 90555-038, FCI Allenwood, P.O. Box 2000, White Deer, PA 17887.

_____
TODD E. NEWHOUSE
Assistant U.S. Attorney

12